HARTFORD ACCIDENT AND INDEMNI-
TY COMPANY, Appellant,

v.

Edgar Thomas HELMS, Appellee.

No. 553.

Court of Civil Appeals of Texas,
Tyler.

May 27, 1971.

Rehearing Denied June 10, 1971.

Ramey, Brelsford, Flock, Devereux & Hutchins, Mike Hatchell, Tyler, for appellant.

Brown, Herman, Scott, Young & Dean, Massie Tillman, Fort Worth, for appellee.

McKAY, Justice.

Edgar Thomas Helms, appellee, filed suit against appellant, Hartford Accident and Indemnity Company, to recover workmen's compensation benefits for injuries he alleged to have suffered while working for his employer in the course of his employment. Trial was had before a jury which resulted in a verdict for appellee, upon which verdict judgment was rendered for appellee for $13,656.48 for total and permanent incapacity plus an additional amount for hospital and medical expenses.

Appellee alleged he sustained a general injury, or in the alternative, he sustained an injury to his right arm which extended to and affected his shoulder and body generally. Appellant answered that if appellee sustained any incapacity (or will in the future), it was solely caused by the incapacity to his right arm, by the loss of use or partial loss of use of same, and was confined to his right arm.

■ Appellant's first point complains that there was no evidence to support the submission of Special Issues Nos. 3, 4, 5, 6 and 6b. The jury found appellee sustained an accidental injury to his arm on April 24, 1968 (Issues 1 and 1A); such injury to the arm was a producing cause of total incapacity (Issues 2 and 2A); the arm injury extended to and affected his shoulder thereby causing incapacity to the shoulder (Issue 3); incapacity to the shoulder was

a producing cause of total incapacity (Issue 4); appellee's initial injury consisted, in part, of an accidental injury to the shoulder (Issues 5 and 5A); such shoulder injury was a producing cause of total incapacity (Issue 6); and that such total incapacity was permanent (Issue 6b).

By points 2 through 6, appellant contends there was insufficient evidence to support the jury's answers to the same issues, or the answers by the jury are against the great weight and overwhelming preponderance of the evidence. We will discuss these points together.

Appellee was an employee of Staton Lumber Yards in Jacksonville and had worked there several years doing various jobs. On April 24, 1968, appellee, with other employees, was unloading bundles of insulation from a warehouse onto a truck. Appellee would throw the bundles of insulation through the warehouse door onto a loading platform where another employee would load it onto the truck. Appellee said when he made a swing to throw a bundle onto the loading platform, his shoulder popped and the pain went down his shoulder and under his shoulder blade and back up into his neck and down into his arm. Appellee was injured on Wednesday and he worked the following Thursday and Friday, but he stayed at home Saturday, Sunday and Monday and went to see Dr. W. E. Gabbert on the following Tuesday. He testified his arm and shoulder had severe pain from the time of the injury. Appellee saw Dr. Gabbert regularly for several days, and Dr. Gabbert diagnosed the injury as a ruptured biceps tendon. When appellee's condition did not respond to conservative treatment by Dr. Gabbert, he called in Dr. Leland Wilcox, an orthopedic surgeon, and on June 9, 1968, Dr. Wilcox performed a surgical procedure to remove a torn biceps tendon and muscle and to rejoin same. Plaintiff's testimony was that he had pain in both his arm and his shoulder beginning with the time the injury occurred,

and that he could not use either of them from the time he did not return to work on Monday following his injury on Wednesday.

Dr. Gabbert testified in part, as follows:

"Q What history, what did he tell you had happened?

"A Well, *he told me he complained of his arm and shoulder hurting him* [1] and stated that on the 24th, I think, while unloading some shingles, throwing bundles of shingles he noticed *sudden pain in the right shoulder and upper arm and neck.* He had tried to work the following day but the pain was so severe that he came in to see me.

"Q What did your examination consist of?

"A Pardon.

"Q What did your examination consist of?

"A Well, examination of the injured part in his complaint.

"Q What did you find?

"A Well, examination of the right shoulder area revealed what appeared to be a rupture of the bicep tendon of the right arm and *tenderness over the cervical neck and over the scapula area, he complained bitterly of pain over the scapula area.*

"Q *Where is the scapula area?*

"A *The wing bone or the back of the shoulder.*

"Q *The shoulder blade?*

"A *The shoulder blade.*

"Q I believe he complained of pain in the shoulder area?

"A The shoulder area, neck, scapula and upper arm.

---

1. Emphasis added unless otherwise indicated.

\* \* \* \* \* \*

"Q How long was it before you saw him again?

"A Several days, three or four days.

"Q Was there any change?

"A *No improvement, still complaining bitterly of pain.*

"Q *Where?*

"A *In the shoulder girdle, upper arm, neck, scapula.*

"Q Do you have a date as to any improvement?

"A Well, let me refer to my notes here, I can't remember all of that. I saw him originally on the 30th and I saw him next on the 6th and at this time there was a hard knot in the upper head of the bicep, very painful, *shoulder motion was markedly restricted* and he was allowed to keep the arm in a sling and given again medication for ease.

"Q When did you see him again?

"A I saw him again on the 14th.

"Q What did you find on that occasion?

"A Well, *there was no improvement in the function of the shoulder.* He was unable to raise his arm. The bicep muscle was not as swollen, but there was still an area of hardness and *complaining of the back of his shoulder over the scapula area* again and his neck and he was given some medication for arthritis and then after that, I next saw him, do you want me to go down the line here?

\* \* \* \* \* \*

"Q *Does the biceps tendon have anything to do with the shoulder?*

"A *Well, it attaches to the glenoid process of this joint.*

"Q *The shoulder joint?*

"A *The shoulder joint.*

\* \* \* \* \* \*

"Q *Do you have an opinion, Doctor, whether or not this injury to his arm of April 24, 1968, extended to and affected his shoulder thereby causing his incapacity?*

"A *Yes.*

"Q *What is that opinion?*

"A *Well, the tendon attaches to the glenoid process of the shoulder joint so, I mean it is part of the injury.*

"Q *Is your answer yes?*

"A · *Yes.*

\* \* \* \* \* \*

"Q *Is the incapacity to the shoulder a producing cause of the total disability?*

"A *Yes.*

"Q *Do you have an opinion as to whether or not the initial injury on April 24, 1968 consisted at least in part to the shoulder?*

"A *Yes.*

"Q *What is that opinion?*

"A Back to the same thing, I mean the tendon inserts into the, originates from the scapula which is made up of the scapula which makes up the shoulder and upper arm.

"Q Do you have an opinion as to whether or not the injury to his shoulder that we just got through talking about, was a producing cause of his total disability?

"A Do you want me to yes or no or what?

"Q If you can give me a yes or no?

"A Well, it could be yes.

"Q Yes, you have an opinion?

"A Yes.

"Q What is your opinion?

"A *My opinion is that the injury sustained to the biceps tendon by reason of the fact that it is attached to the glenoid process of the shoulder is the cause of his disability.*

"Q *Is your answer to my question yes?*

"A *Yes.*

"Q *Do you have an opinion as to whether or not the injury to the plaintiff's shoulder was a producing cause of this total disability?*

"A *Yes, that has been answered.*

"Q *You do have an opinion?*

"A *Yes.*

"Q *In your opinion was that the producing cause?*

"A Well, as I have stated several times now, *the injury as sustained it involves the biceps tendon injury to the shoulder.*

"Q *And was that the producing cause of the total disability?*

"A *Yes.*

"Q *Now, is this man's disability or is this man's injury either one, confined to his arm, and when I say arm I mean below his shoulder?*

"A *No.*

　　*　　*　　*　　*　　*　　*

"Q *All right. Do you have an opinion as to whether or not he sustained an injury to his shoulder?*

"A I know what you are trying to get me to say, but again I think my answer would have to be this, *the tendon is attached to the shoulder, so if the tendon is injured it involves the shoulder.*

"Q You are saying that the tendon is in the arm and shoulder both, is that what you are saying?

"A Yes."

Dr. Wilcox testified, in part, as follows:

"Q All right, Dr. Wilcox, if you assume that on April 24, 1968, this man was pitching some bundles of asphalt and while doing so felt a popping sensation in his shoulder and immediate pain in his right shoulder and immediate pain in his right bicep and the right portion of his right shoulder and the right portion of his neck and that this pain persisted and continued for approximately six days until he was seen by Dr. Gabbert and he was seen by Dr. Gabbert over several weeks period of time and then he was placed in Rusk Memorial Hospital where you saw him and made your findings. If you assume these facts to be correct, Doctor, would you have an opinion as to whether or not the initial injury that this man sustained was confined just to his arm below the shoulder or to the shoulder and—

"A Any injury that could precipitate any muscle tear in an apparently healthy muscle could also result in ligamentous damage in other areas of the region where the force was applied, which means that he could have torn small tendons in the shoulder which pass from the arm or humerus to the scapula or wingbone. He could have likewise ruptured some of the muscle fibers in those muscles which extend from the neck to the scapula or wingbone.

"Q If you assume that those facts are true, Doctor, is it reasonably medically probable that that is what did happen?

"A It is quite reasonable that could have happened, yes, sir.

　　*　　*　　*　　*　　*　　*

"Q All right. And Dr. Wilcox, if you had found evidence of shoulder in-

jury in this man, you would have no hesitancy in telling this Jury that you found that?

"A I would not. The evidence of injury, of course, we get down into the problems of objective and subjective evidence, and certainly injury to his shoulder involves not only the bone and soft tissues, ligaments and muscles don't show on X-rays. So if the man is having difficulty in his shoulder X-rays may be of no value other than to say there is no bony changes or calcium or whatnot. He may still have a torn tendon or he may have a ruptured muscle but your X-ray is not going to help you one way or the other from that standpoint. So when I was looking for injury to his shoulder I was looking not so much for bone damage truly, unless maybe he had pulled off a little fragment of bone. I was looking mainly for tendon injury, so called bursitis, located to the rupture of the small muscle or tendon that forms the actual cut over this bone and bursitis will cause pain in the tendon area. And they feel it and they won't use their wingbone and the first thing they know they can't move their arm and neither can you. So we call that a frozen shoulder. *This is some of the cause of his problem other than the bicep muscle or torn bicep.*

\* \* \* \* \* \*

"Q Now, with that in mind if you assume that this man had complained from the start of pain in this upper portion of the shoulder, above the shoulder and has continued for two years to complain of pain in that area, do you have an opinion as to whether or not there was in fact an injury, an initial injury to this area above the actual shoulder joint, we will call it?

"A *With pain around the shoulder I consider there is something wrong, there, yes.*"

Dr. E. L. Mahon, an orthopedic surgeon testified, in part as follows:

"Q Now, Doctor, if you assume for a moment that on April 24th, 1968, when this man sustained this injury while lifting this object that at the instant he sustained the injury he felt pain in his shoulder and on up into his neck and in his right bicep, all of this on the right side and then assuming all of the facts that you found in your examination of him in November of 1968, do you have an opinion as to whether or not this initial injury was an injury to the, just the arm below the shoulder or an injury to the shoulder?

"A Well, assuming those things happened at the time of the injury—

"Q Well, let me further ask you to assume that ever since the date of that injury, up to and including the present time you said persistent and continued pain in the shoulder itself and the upper portion of the arm up into the neck area?

"A *That being the case I would say his disability was in his shoulder and arm.*

"Q Shoulder and arm?

"A Yes, sir.

\* \* \* \* \* \*

"Q *Do you have an opinion as to whether or not this injury and disability is confined below his shoulder?*

"A Yes, I have an opinion.

"Q What is that opinion?

"A *Well, I felt from my examination it did involve the shoulder as well as the arm.*

"Q *Well, what is your answer then to my question?*

"A *That it is not confined to the arm.*"

We find that the evidence is sufficient to support the answers of the jury to Issues 3, 4, 5, 6 and 6b. Appellee sued for a general injury, and in the alternative, an injury to his right arm which extended to and affected his shoulder and body generally. The jury found an arm injury which extended to and affected his shoulder and incapacitated the shoulder as well as an injury to the shoulder itself, and each injury was found to be a producing cause of his total incapacity. By Special Issues 25, 26 and 27, the jury found that appellee's incapacity was not solely caused by the incapacity of his right arm, by the loss of use of his right arm, or was or will be confined to his right arm.

 It is well established that where injury results to a particular member of the body, compensation for the loss of which is specially provided by statute, the liability of the insurer is limited to that amount, even though the loss of or injury to that particular member actually results in total permanent incapacity of the employee to labor. But, an employee is not precluded from recovering for total incapacity if he alleges and proves that the injury to the particular member also extended to and affected other portions of his body, or impaired his general health to such an extent as to totally and permanently incapacitate him. Consolidated Underwriters v. Langley, 141 Tex. 78, 170 S.W.2d 463 (1943).

The case at bar may be distinguished from Travelers Insurance Co. v. Marmolejo, 383 S.W.2d 380 (Tex.Sup., 1964); Texas Employers' Ins. Ass'n v. Espinosa, 367 S.W.2d 667 (Tex.Sup., 1963), and Texas Employers' Ins. Ass'n v. Brownlee, 152 Tex. 247, 256 S.W.2d 76 (1953). We quote from *Marmolejo:*

"On the other hand we have stated several times that the claimant must al-lege, prove and secure a finding that the injury to the specific member extended to and affected other portions of the body. See Texas Employers' Ins. Ass'n v. Espinosa, Tex.Sup., 367 S.W.2d 667; Argonaut Ins. Co. v. Newman, Tex.Sup., 361 S.W.2d 871; Texas Employers' Ins. Ass'n v. Brownlee, 152 Tex. 247, 256 S.W.2d 76; Consolidated Underwriters v. Langley, 141 Tex. 78, 170 S.W.2d 463. It was held in *Espinosa* and *Brownlee,* moreover, that pain caused by an injury to a particular member and felt in another part of the body is not, of itself, sufficient to support a recovery for anything more than the original specific injury. Under our Workmen's Compensation Act as interpreted and applied in these cases, the plaintiff does not establish his right to a judgment for general disability by merely showing that a specific injury has affected the body generally and thereby caused incapacity. He must go further and obtain a finding that his incapacity was caused by an extension of the injury to some part of the body other than a specific member. This was not done in the present case, and we hold that the trial court erred in overruling the first objection mentioned above. * * *"

In the instant case, appellee complained of pain in his shoulder from the time of his injury. The medical evidence was that appellee had an injury to his shoulder and that the injury to his arm extended to and affected his shoulder. Appellee obtained jury findings that such arm injury extended to and affected his shoulder causing incapacity to the shoulder, and that the initial injury to the arm was also an injury to his shoulder, causing incapacity. Injury to the shoulder is a general injury. Appellant's points 1 through 6b are overruled.

This Court has examined appellant's points 7, 8 and 9 and find them without merit.

The judgment of the trial court is affirmed.